1    JS-6

2
                                                                  CC: BK COURT
3

4

5

6

7

8
                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10

11   In re                          | Bankr. Case No. SA BK 08-13421-ES

12   FREMONT GENENERAL
     CORPORATION,
13
              Debtor.
14   ─────────────────────

15                                   | Case No.  SA CV 14-01016-AB
     GWYNETH COLBURN.
16
              Claimant-Appellant,
17
     v.
18
     FREMONT GENERAL
19   CORPORATION .

20            Debtor-Appellee.

21   ─────────────────────

22   KYLE WALKER.              | Case No. SA CV 14-01017-AB

23            Claimant-Appellant,
                                  **OPINION**
24   v.

25   FREMONT GENERAL
     CORPORATION .
26
27            Debtor-Appellee.

28

Appeals from the United States Bankruptcy Court

for the Central District of California.

Hon . Erithe Smith, Bankruptcy Judge, Presiding.

Affirmed.

In these related bankruptcy appeals, Appellants Gwyneth Colburn ("Colburn") and Kyle Walker ("Walker," collectively "Appellants") contend the Bankruptcy Court erred in granting debtor Freemont General Corporation's ("FGC") motions to disallow their claims in the underlying bankruptcy proceedings.  In the underlying proceedings, the bankruptcy court concluded Appellants, former executives at FGC's subsidiary, failed to state a claim against FGC for debts owed under severance pay clauses in Appellants' Management Continuity Agreements with FGC.   This Court has jurisdiction to hear the appeal under 28 U.S.C. section 158(a), and **AFFIRMS** the bankruptcy court's order.

Neither Appellants nor Appellee requested oral argument, and the Court construes the matter as submitted on the briefing. Fed. R. Bankr. P. 8019(a), (g). Moreover, the Court finds the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.  Fed. R. Bankr. P. 8019(b)(3).

**I.     Background**

**A.     Summary of  the Evidence**

The bulk of the relevant evidence before the bankruptcy court and before this Court on appeal is uncontested.  Rather, it is the bankruptcy court's interpretation of the (sometimes conflicting) evidence that is truly at issue on this appeal.  The material evidence is as follows.

### 1.      Appellants' Management Continuity Agreements

Appellants both began working for mortgage lender Freemont Investment & Loans ("FIL") in 1994.  (AA,[1] Vol. 8, Tab 28, p. 2273; Tab 29, p. 2283.)  FIL was a wholly owned subsidiary of debtor FGC.  (AA., Vol. 6, Tab 8, p. 1659; Tab 9 p. 1672.)  Walker became President and CEO of FIL in 2006, and Colburn served as Executive Vice President of FIL's Commercial Real Estate ("CRE") division for the duration of her employment at FIL.  (AA, Vol. 6, Tab 8, p. 1660; Tab 9, p. 1673.)  Both Colburn and Walker also served on FIL's board of directors.  (AA, Vol. 6, Tab 8, p. 1661; Tab 9, p. 1673.)

As top executives at FIL, Appellants entered into Management Continuity Agreements ("MCAs") with FIL and FGC, effective August 7, 2003.  (AA, Vol. 8, Tabs 28 & 29.)  By later agreements, the MCAs remained effective through August 7, 2009.  (AA, Vol. 9, Tabs 30 & 31.)  The portions of the MCAs at issue in this appeal were identically worded except that Walker's MCA defined "Executive" as meaning Walker and Colburn's MCA defined "Executive" as meaning Colburn.  (AA, Vol. 8, Tabs 28 & 29.)  Relevant for these proceedings, both MCAs provided if Appellants' employment was terminated "within the thirty-six (36) month period following a Company Event, then the Executive shall be entitled to receive severance benefits … ."  (AA, Vol. 9, Tab 28, p. 2275¶6(a); Tab 29, p. 2285¶6(a).)  If Appellants' were

---

[1] Although Appellants submitted separate records for each appeal, the records in each appeal are identical, and the court refers to them jointly as Appellant's Appendix or "AA."

3

terminated without cause within 36 months of a "Company Event," the MCAs provided Appellants would be entitled to 36-months pay within 10 days of their "Termination Date."   (AA, Vol. 8, Tab 28, p. 2275, ¶6(a)(1); Tab 29, p. 2285, ¶6(a)(1).)

Central to this appeal, are two terms of art defined in the MCAs: a "Company Event" and a "Termination Date."  A "Company Event" as defined by the MCAs occurred when any person or entity other than FGC (or an FGC affiliate) "directly or indirectly acquire[d] or control[led] … more than fifty percent (50%) of the voting securities or assets of FIL in a transaction or series of transactions."  (AA, Vol. 8, Tab 28, p. 2278, ¶(8)(b)(ii); Tab 29, 2288, ¶8(b)(ii).)    The MCAs further defined a "Termination Date" as "the date on which a notice of termination is given" to the Executive.[2]  (AA, Vol. 8, Tab 28, p. 2279, ¶8(e)(ii); Tab 29, p. 2289, ¶8(e)(ii).)

The MCAs also set forth certain notice requirements for the "notice of termination" described in the definition of a "Termination Date."   The MCAs generally required that notice of an Executive's employment be made in writing to the Executive be and given by personal delivery or by U.S. Mail to the Executive's home address.  (AA, Vol. 8, Tab 28, p. 2280, ¶10(a); Tab 29, p. 2289, ¶10(a).)  Moreover, the MCAs provided that any termination notice:

> "shall indicate the specific termination provision in [the MCA] relied upon, shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination under the provision so indicated, and shall specify the termination date (which shall not be more than 30 days after the giving of such notice."

---

[2] The MCAs included alternative definitions for both terms, none of which are relevant here.

4

1  (AA, Vol. 8, Tab 28, p. 2280, ¶10(b); Tab 29, p. 2290, ¶10(b).)

2

3      Though somewhat unusual to the layman, the MCAs articulated the logic

4  behind these sizeable compensation contingencies.  FGC "expected that [it] from time

5  to time [would] consider the possibility of an acquisition by another company or other

6  significant Company event" and "that such consideration can be a distraction" to high-

7  level employees involved in the decision-making process.  (AA, Vol. 8, Tab, 28, p.

8  2273, Recital A; Tabt 29, p. 2283, Recital A.)  Realizing that top-level executives like

9  Walker and Colburn might be reluctant to consider an acquisition that would

10 otherwise be in FIL's or FGC's best interests if such an acquisition would threaten

11 their individual livelihoods, the MCAs sought to "provide the Executive with financial

12 security and provide sufficient incentive and encouragement to the Executive to

13 remain with the Company notwithstanding the possibility of a Company Event."

14 (AA, Vol. 8, Tab, 28, p. 2273, Recital C; Tabt 29, p. 2283, Recital C.)

15

16          **2.     The iStar Transaction**

17

18     After the Federal Deposit Insurance Company declared FIL a "troubled

19 institution" in February 2007 (FGC Appendix ("FA"), Tab 53, p. 20), FGC and FIL

20 decided to exit the residential and commercial real estate businesses.  (AA, Vol. 6,

21 Tab 8, p. 1662, ¶18; Tab 9, p. 1675, ¶21.)  That same month, FGC and FIL began

22 negotiating with iStar Financial, Inc. ("iStar") to sell its entire CRE loan portfolio to

23 iStar.  (AA, Vol. 6, Tab 8, p. 1662, ¶19; Tab 9, p. 1675, ¶21.)  Ultimately on May 14,

24 2007, FGC and FIL's boards of directors (including Appellants as FIL directors)

25 jointly voted to approve the sale of the CRE division to iStar for a total of $1.89

26 billion in cash and a 70% profit participation interest in the loan portfolio.  (AA, Vol.

27

28

1   6, Tab 8, p. 1662, ¶20; Tab 9, p. 1675, ¶27; FA, Tab 59, pp. 84-94.)[3]

2

3       On May 21, 2007, FIL entered into an Asset Purchase Agreement ("APA") with

4   non-party iStar Financial, Inc. ("iStar").  In the APA, FIL agreed to sell its entire CRE

5   loan portfolio to iStar.  (AA, Vol. 11, Tab 44, p. 2743, §2.01.)  The APA provided that

6   FIL would "sell, assign, transfer, convey and deliver, or cause to be assigned,

7   transferred, conveyed and delivered" FIL's CRE loan portfolio to iStar "on the

8   Closing Date."  (*Id.*)  Under the APA, the closing date would be 11:59 p.m. on the last

9   business day of the month during which various escrow conditions were satisfied.

10  (AA, Vol. 11, Tab 44, p. 2747, §2.05.)  In executing the APA, FGC also covenanted

11  to manage the CRE assets "prudently and in the ordinary course of business" and

12  promised not to "take any material actions" with respect to any of the loans during the

13  escrow period without iStar's prior written consent.  (AA, Vol. 11, Tab 44, p. 2766,

14  §5.01(a).)

15

16      Additionally, after FIL and iStar executed the APA, iStar put a number of its

17  employees in FIL's offices prior to closing.  (AA, Vol. 7, Tab 11, p. 1709, ¶18.)  For

18  example, after the APA, Bert Haboucha (a Vice President of Special Assets in FIL's

19  CRE division) started dealing with a number of executives at iStar.  (*Id.*, at p. 1710,

20  ¶20.)  Haboucha testified that various iStar executives began calling or emailing him

21  about specific assets several times a week and that, for all intents and purposes, an

22  iStar executive (Barbara Rubin) became his "boss" after May 21, 2007.  (*Id.*, at p.

23  1710, ¶¶20-21.)  Haboucha further testified that he was told Colburn (his boss at FIL)

24

25      [3] FGC argued below that the sale did not constitute a "Company Event" because FGC
    retained a profit 70% interest in the CRE loans.   (AA, Vol. 8, Tab 17, p. 2132.)  The bankruptcy
26  court rejected this argument, concluding that (coupled with a separate sale of FIL's residential real
    estate portfolio to a separate company not at issue here) FIL's 70% participation interest in profits
27  the CRE assets was separate from an interest in the loans themselves and constituted part of the
    purchase price, not actual retention of 70% of the assets.  (Fremont Appendix ("FA"), Tab 68, pp.
28  187-188.)  FGC does not contest this holding on appeal.

1   no longer had authority to approve transactions related to the Special Assets Haboucha

2   oversaw and he only sought iStar's approval after May 21, 2007.  (*Id*., at p. 1710,

3   ¶¶21-23; p. 1710-11, ¶¶26-28.)   Former FIL Senior Vice President for CRE loan

4   originations Thomas Whitesell similarly testified that he could not originate any new

5   loans without prior approval from iStar – a reality Whitesell testified predated the

6   APA.  (AA, Vol. 7, Tab 12, pp. 1723-25, ¶¶6-14.)

7   ///

8   ///

9   ///

10   ///

11       After a roughly one-month escrow period, FIL executed two formal

12   "Assignment and Assumption" documents on June 25, 2007 [4] "grant[ing],

13   bargain[ing], sell[ing], assign[ing], transfer[ing] and set[ting] over unto [iStar]" as set

14   forth in the APA.  (AA, Vol. 11, Tab 44 p. 2795, ¶2; Tab 47, p. 2821, ¶2.)   In the

15   Assignment and Assumption Agreements, iStar also agreed to "accept the foregoing

16   assignment" and "assume[] all of [FIL's] obligations, right, title, interest, claim and

17   demand in and to the Loans and the Loan Documents … [and] all rights to act as

18   agent, servicer or lead lender in connection therewith or thereunder … ."  (AA, Vol.

19   11, Tab 44 p. 2795, ¶3; Tab 47, p. 2821, ¶3.)   The Assignment and Assumption

20   agreements stated that the assignment and the assumption would both take place on

21   the "Effective Date," which the agreements defined as June 29, 2007.  (AA, Vol. 11,

22   Tab 45 p. 2795, "Background Fact" D; Tab 47, p. 2821, "Background Fact" D.)

23   Consistent with the APA's definition of the "Closing Date," the "Effective Date" for

24   the assignments date was the last business day of June 2007, the month in which all

25

26       [4] According to Appellant's expert Robert Plante, the final escrow condition was satisfied on
27   June 22, 2007 when the FDIC notified FIL's counsel that the FDIC had no objection to the iStar
     transaction.  (AA, Vol. 7, Tab 13, p. 1743, ¶40.)  FIL and iStar executed the Assignment and
28   Assumption agreements three days later on June 25, 2007.

7

1   escrow conditions were satisfied.  (*See* AA, Vol. 11, Tab 44, p. 2747, §2.05.)

2

3   On June 29, 2007 FIL transferred all of the assigned assets to the escrow
4   company, First American Title National Commercial Services ("First American")
5   pending confirmation from both iStar and FIL that the sale had closed.  (FA, Tab. 64,
6   p. 110.)  However, iStar failed to wire the purchase price to FIL on the June 29 closing
7   date, and instead wired the payment on July 2, 2007 (the following business day).
8   (AA, Vol. 10 , Exh. 42, p. 2722; FA, Exh. 64, p. 110.)  iStar having made belated
9   payment on July 2, FIL and iStar sent a joint letter to First American on July 2,
10  notifying First American that the escrow had closed as of July 2, and instructing First
11  American to record the assignments.  (FA, Exh. 64, p. 110.)    First American
12  ultimately recorded a portion of those assignments on July 3, 2007 and recorded the
13  remaining assignments on July 9, 2007.  (AA, Vol. 11, Tab 45, p. 2794; Tab 47, p.
14  2819.)

15

16  Appellant's trial expert Robert Plante acknowledged in his trial declaration that
17  the iStar transaction "formally 'closed'" on July 2, 2007 when iStar made final
18  payment to FIL.  (AA, Vol. 7, Tab 13, p. 1744, ¶42.)  However, it was Plante's
19  opinion that a "Company Event" was not tied to the formal closing, but that the
20  "Company Event" occurred when iStar and FIL executed the APA on May 21, 2007,
21  and no later than 12:00 a.m. on June 29, 2007.  (AA, Vol. 7, Tab 13, ¶¶36, 44.)
22  FGC's trial expert Michael LeRoy disagreed with Plante's conclusion, opining that
23  "some form of payment (in this case cash and the Participation Interest) in exchange
24  for the assets" was essential to "complete the iStar transaction."  (FA, Tab 67, p. 164,
25  ¶16(a).)  According to Mr. LeRoy, until the CRE assets and the payment actually
26  changed hands, "the assets had not yet been acquired, nor become subject to the
27  control" of iStar.  (*Id*., at p. 164, ¶ 16(b).)  Mr. LeRoy testified that both general
28  accounting principles along with FIL's and iStar's financial reports supported the

conclusion that iStar did not acquire or control the CRE assets until the transaction closed on July 2, 2007.  (*Id*., at pp. 164-167, ¶¶16(b)-(h).)  As for the provisions of the APA limiting FIL's ability to originate new loans, sell or modify existing loans, or make any decisions materially affecting the CRE assets pending sale, Mr. LeRoy testified such provisions were "standard operating procedure" in large-scale asset purchases and did not vest iStar with any actual control over the CRE assets.  (*Id*., at pp. 166-67, ¶16(f).)

///

///

///

### 3.    Appellants' Terminations

#### a.    Kyle Walker

At the time FIL's board voted to approve the APA, Walker knew that sale of the CRE division to iStar would ultimately lead to his termination.  (AA, Vol. 6, Tab 8, p. 1662, ¶¶21-23.)  On June 22, 2007 – the day the FDIC approved the iStar transaction – Walker sent a letter to FGC's CEO "to provide written notice" under the MCA "of the occurrence of events constituting an 'Involuntary Termination'" under the MCA and to "confirm the occurrence of a 'Company Event'" under the MCA.  (AA, Vol. 9, Tab 34, p. 2297.)  No one ever responded to Walker's June 22 letter.  (AA, Vol. 6, Tab 7, ¶19.)  A week later, on June 29, 2007, FGC gave Walker written notice of his termination.  (*Id*., at p. 1636-37, ¶22 (pretrial stipulation that "On the morning of June 29, 2007, Walker was given written notice of his termination); AA, Vol. 9, Tab 32 p. 2295.)  The termination letter was formulated using boilerplate language under FGC's Separation Pay Guidelines (AA, Vol. 6, Tab 7, p. 1637, ¶24), and was sent out to officers and non-officer's alike, including individuals who did not have an MCA in place.  (AA, Vol. 7, Tab. 14, pp. 1829-36.)

1

2    In Walker's termination letter, FGC informed Walker that "[d]ue to recent
3    organization changes," June 29, 2007 would be Walker's "last day in the office."
4    (AA, Vol. 9, Tab 32, p. 2295.)  Walker knew that June 29 would be his last day in the
5    office before he received the termination letter.  (AA, Vol. 13, Tab 53, p. 3314:4-7.)
6    Walker testified that he performed no further work for FIL after June 29.  (*Id*., at p.
7    3317:6-8.)  Mr. Walker further testified that he believed his employment had been
8    terminated on June 29 "because the terms of [his] office essentially had changed … ."
9    (*Id*., at p. 3318:14-17.)  In a July 24, 2007 follow-up letter to FGC about his rights
10   under the MCA, Walker reiterated his understanding that a "Company Event" had
11   occurred, and stated: "On June 29, 2007, my employment with [FGC] and [FIL] was
12   terminated by the Company without cause."  (AA, Vol. 9, Tab 35, p. 2302, .)  FGC
13   shared Walker's understanding of a June 29, 2007 Termination Date in an October
14   2007 10-K filing with the Securities and Exchange Commission, stating:

15

16   > "Effective June 29, 2007, Alan W. Faign, the Company's
17   > Secretary, General Counsel and Chief Legal Officer, and Chief
     > Legal Officer of FIL, was appointed Interim President and
18   > Chief Executive Officer of FIL, replacing Kyle R. Walker."

19
20   (AA, Vol. 9, Tab 36, p. 2320.)

21

22   However, Walker's June 29 termination letter also stated that Walker's
23   "employment with [FIL] will terminate on August 28, 2007" and that "during the next
24   sixty days" following June 29, 2007 Walker would "continue on FIL's payroll… ."
25   (AA, Vol. 9, Tab 32, p. 2295.)  Before trial, the parties stipulated that the sixty-days of
26   additional payment reflected FGC's legal obligations under the WARN Act (29
27   U.S.C. §2101, *et seq*.), which governs employers' conduct in the wake of mass lay-
28   offs.  (AA, Vol. 6, Tab 7, p. 1637, ¶24.)  Walker testified he understood the

termination letter's reference to August 28, 2007 and a sixty-day period to be FGC's and FIL's attempt to satisfy the WARN Act by providing 60-days' notice of a lay-off. (AA, Vol. 13, Tab 54, pp. 3340:11-3341:2; *see also* AA, Vol. 7, Tab 14, p. 1831:9-17 (FGC's PMQ testifying that FGC added 60-day notice period language to boilerplate termination letter in light of the WARN Act.)  However, Walker further testified that neither he nor Colburn[5] had any position at FIL after June 29, 2007.  (AA, Vol. 13, Tab 54, p. 3342:9-14.)  Still, in a December 20, 2007 letter to the FDIC regarding FGC's potential liabilities to former executives, FGC stated that Walker and Colburn were both "terminated …on August 28, 2007."  (AA, Vol. 11, Tab 51, p. 2993.)

### b.    Gwyneth Colburn

Unlike Walker, Appellant Colburn initially believed she would "go over to iStar" at the conclusion of the iStar transaction.  (AA, Vol. 6, Tab 9, p. 1676, ¶24.)  At that time, Colburn expected she would become an employee at iStar "when the CRE division was sold," which Colburn testified she expected would be July 2, 2007, the first business day after the anticipated June 29, 2007 closing date.  (*Id*.)  Ultimately, however, Colburn did not get a job with iStar because of certain fundamental differences of opinion between Colburn and iStar's CEO, who "already did for iStar what [Colburn] did for FIL's CRE division."  (*Id*., at p. 1676, ¶24.)

Her employment discussions with iStar having fallen apart, FIL gave Colburn a "written notice of her termination" on June 28, 2007.  (AA, Vol. 6, Tab 7, p. 1637, ¶23 (pretrial stipulation to that effect); AA, Vol. 6, Tab 9, p. 1679, ¶34; AA, Vol. 9, Tab 33, p. 2296.)  Colburn's termination letter was virtually identical to Walker's, although Colburn's letter was sent on behalf of FIL and signed by Walker.  (AA, Vol.

---

[5] As discussed more fully below, Walker, as Colburn's boss at FIL, signed Colburn's termination letter.  (AA, Vol. 6, Tab 7, p. 1637, ¶25.)

6, Tab 7, p. 1637, ¶25; AA, Vol. 9, Tab 33, p. 2296.)  Colburn's letter informed her that "[d]ue to the sale of the Commercial Real Estate division, [FIL] is eliminating your position."  (AA, Vol. 9, Tab 33, p. 2296.)  Like Walker's termination letter, Colburn's termination letter stated that her "employment with FIL will terminate on August 28, 2007" but that June 29, 2007 would be her "last day in the office."  (*Id*.)  Also as with Walker, Colburn's termination letter indicated that she would "continue on FIL's payroll" for the "next sixty days."  (*Id*.)  This 60-day period again reflected the requirements imposed by the WARN Act on employers conducting lay-offs.  (AA, Vol. 6, Tab 7, p. 1637, ¶24.)

### A. Proceedings Below

FGC filed for Chapter 11 bankruptcy on June 18, 2008 in *In re Freemont General Corporation*, No. SA BK 08-13421-ES.[6]  Walker filed a proof of claim with the bankruptcy court on August 28, 2008 (Claim 101) asserting that FGC breached his MCA by not paying him the 36-months' salary (and other assorted benefits) after his termination, and asserting a debt of approximately $2.5M.  (AA, Vol. 1, Tab 1, pp. 1-7.)  Colburn filed a similar proof of claim on November 10, 2008 (Claim 809), asserting FGC breached her MCA and asserting a debt of roughly $2.5M.  (AA, Vol. 1, Tab 2, pp. 48-49.)  FGC separately moved to disallow Walker and Colburn's claims.  (AA, Vol. 1, Tabs 3 & 4.)  After a number of procedural machinations not relevant here, the bankruptcy court ultimately set the motions for a three-and-a-half-day bench trial beginning on January 21, 2014  (AA, Vol. 12, Tab 52 thru Vol. 14, Tab 55), and took the matters under submission at the close of trial.  (AA, Vol. 14,

---

[6] FGC was reorganized in bankruptcy under the new name Signature Holdings Group, Inc. The Court refers to the debtor under its former name, FGC, for the sake of consistency with the case caption, the proceedings below, and the briefing on appeal.

Tab 55, p. 3636:4-5.)  On March 21, 2014, the bankruptcy court granted both motions to disallow Walker's and Colburn's claims with an oral ruling from the bench.  (FA, Tab 68.)

In granting the motions, the bankruptcy court made a number of findings relevant to the instant proceedings.  First, the court below found that the iStar transaction constituted a "Company Event" under Walker's and Colburn's MCAs. (FA, Tab 68, pp. 186:25-189:2.)[7]  The bankruptcy court further found the "Company Event" occurred on "July 2, 2007, the closing date, and that there were not transfer[s] of any assets prior to the July 2nd closing."  (*Id.*, at p. 182:15-17.)  As to the fact that the Assignment and Assumption Agreements "were prepared with a June 29th date," the bankruptcy court determined that date was "really of no consequence, as the assignment of documents were delivered to escrow prior to closing, not to iStar, and the assignments were not recorded until on or after the closing date."  (*Id.*, at p. 182:18-23.)  Nor was the bankruptcy court persuaded by Appellant's contention that iStar obtained actual control over the CRE assets on May 21, 2007.  Considering both the language of the APA affording iStar limited rights over the management of the CRE assets, and the expert testimony that such rights were standard operating procedure, the bankruptcy court concluded that the evidence of iStar's influence over the CRE division from May 21 through July 2 was not evidence of actual control. (*Id.*, at p. 182:24-183:21.)  Instead, the bankruptcy court found iStar's interim conduct under the APA amounted to "protection to the buyer that the integrity of the loans would be maintained to the buyer's satisfaction pending the close of the sale."  (*Id.*, at p. 183:16-18.)

---

[7] As noted above (see footnote 3) FGC argued below that the iStar transaction did not amount to a Company Event under the MCAs because FIL retained a 70% participation interest in the CRE loan portfolio.  On this point, the bankruptcy court ruled in Appellants' favor and concluded that the iStar transaction constituted a Company Event under the MCAs – a ruling FGC did not appeal.

1

2          Finally, the bankruptcy court found that Walker's and Colburn's "termination

3   dates" for the purposes of the MCAs was June 29, 2007.  The bankruptcy court noted

4   that the written notices of termination were delivered to Walker and Colburn on June

5   29, and concluded that the notices were substantially in compliance with the MCAs'

6   notice requirements for an involuntary termination without cause.  (FA, Tab 68, p.

7   184:6-185:25.)  Although the termination notices gave 60-days' notice rather than the

8   30-days' notice required in the MCAs, for example, the bankruptcy court concluded

9   this extended notice period was required by law under the WARN Act.  (*Id*., at pp.

10  185:12-21, 186:5-7.)   And although the MCAs required a termination notice to

11  identify the specific provision of the MCA relied upon for an involuntary termination,

12  the bankruptcy court concluded that provision was inapplicable as the termination

13  notices made it clear that termination was without cause.  (*Id*., at pp. 185:19-186:4.)

14  When pressed by Appellants' counsel about FGC's subsequent admission to the FDIC

15  that Walker and Colburn were terminated on August 28, the bankruptcy court stated

16  that it "really discounted that [evidence], because there were contradictory statements

17  by both parties on that issue."  (*Id*., at p. 191:19-25.)  Instead, the bankruptcy court

18  determined that, in light of all the evidence, the "Termination Date" as defined in the

19  MCAs was June 29, 2007 for both Walker and Colburn.  (*Id*., at p. 192:9-18.)

20

21          In light of those findings, the court below concluded that Walker and Colburn

22  did not have a claim against FGC for breach of the MCAs.  (FA, Tab 68, p. 191:6-17.)

23  Although the iStar transaction did amount to a "Company Event" under the MCAs,

24  Appellant's rights were never triggered under the MCAs' because their "Termination

25  Date" was June 29, 2007, three days before the "Company Event."   Because

26  Appellants' "Termination Date" did not "follow" the "Company Event," the

27  bankruptcy court held Appellants did not have a pre-bankruptcy claim against FGC

28  and granted FGC's motions to disallow Appellants' claims.  (*Id*.)

1

2       **II.    Legal Standard**

3

4          District courts have jurisdiction to hear appeals from, *inter alia*, "final

5   judgments, order, and decrees" of the bankruptcy courts.  28 U.S.C. §158(a)(1); *see*

6   *also* Fed. R. Bankr. Proc. 8005. *"When reviewing a decision of a bankruptcy court, a*

7   district court functions as an appellate court and applies the standards of review

8   generally applied in federal courts of appeal.*"  In re Guadarrama*, 284 B.R. 463, 468

9   (C.D. Cal. 2002).  On appeal, "[t]he bankruptcy court's findings of fact are reviewed

10  for clear error, while its conclusions of law are reviewed de novo." *In re Strand*, 375

11  F.3d 854, 857 (9th Cir.2004).   "Mixed questions of law and fact are reviewed *de*

12  *novo*." *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998).

13          In reviewing the bankruptcy court's findings of fact for clear error, "[t]his court

14  must accept the bankruptcy court's findings of fact unless, upon review, the court is

15  left with the definite and firm conviction that a mistake has been committed by the

16  bankruptcy judge."  *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009).  "If two views of

17  the evidence are possible, the [bankruptcy] judge's choice between them cannot be

18  clearly erroneous." *In re Marshall*, 721 F.3d 1032, 1039 (9th Cir. 2013), quoting *Price*

19  *v. Lehtinen (In re Lehtinen)*, 332 B.R. 404, 411 (9th Cir. BAP 2005).   "'[C]learly

20  erroneous' is a very exacting standard.… To be clearly erroneous, a decision must

21  strike us as more than just maybe or probably wrong; it must be dead wrong."

22  *Campion v. Old Republic Home Prot*. Co., No. 09-CV-748-JMA NLS, 2011 WL

23  1935967, at *1 (S.D. Cal. May 20, 2011), quoting *Hopwood v. State of Texas*, 236

24  F.3d 256 (5th Cir. 2000) (internal quotes omitted); see also. As the Seventh Circuit

25  Court of Appeals colorfully put it, courts "will not reverse a determination for clear

26  error unless it strikes us as wrong with the force of a 5 week old, unrefrigerated, dead

27  fish."  *S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001); *accord In*

28  *re O'Connell*, 728 F.3d 41, 46 (1st Cir. 2013).

1

2      **III.    Discussion**

3

4           Appellants identify 10 individual issues on appeal. (*Colburn* Appeal, No. SA

5      CV 14-01016-AB, Dkt. No. 15, Colburn Opening Brief ("COB"), pp. 3-5; *Walker*

6      Appeal, No. SA CV 14-01017-AB, Dkt No. 14, Walker Opening Brief ("WOB"), pp.

7      3-5),[8] each of those claims goes more generally to one of the bankruptcy court's two

8      factual findings: (1) that the "Company Event" occurred on July 2, 2007, and; (2) that

9      Appellants' "Termination Date" was June 29, 2007.[9]   The Court addresses each of

10     these findings, and the issues on appeal related to them, in turn.

11

12          **A.    The Bankruptcy Court Did Not Err in Concluding the**

13              **"Company Event" Occurred on July 2, 2007**

14

15          All parties agree that, in order to trigger the MCAs' severance pay provisions,

16     Appellants' Termination Date must have "followed" a "Company Event" – i.e., their

17     Termination Dates must have occurred later in time than the Company Event.  Instead,

18     the parties dispute when each of those relevant events occurred under the MCAs.

19     Turning first to the timing of the Company Event, Appellants assert the Company

20     event occurred "as of midnight on June 29, 2007, if not earlier" and that the

21     ───────────────

22          [8] Although Colburn and Walker identify identical issues on appeal and their opening
       arguments largely parallel one another, their opening briefs are not identical.  However, FGC filed

23     identical opening briefs in opposition to each appeal (*Colburn* Appeal, No. SA CV 14-01016-AB,
       Dkt. No. 18; *Walker* Appeal, No. SA CV 14-01017-AB, Dkt No. 17), and Appellants filed identical

24     replies.  (*Colburn* Appeal, No. SA CV 14-01016-AB, Dkt. No. 19; *Walker* Appeal, No. SA CV 14-
       01017-AB, Dkt No. 18.)  The Court cites separately to Colburn's and Walker's opening briefs, but

25     refers jointly to FGC's opening briefs as "Debtor's Opening Brief" or "DOB" and Appellants' reply
       briefs as "RB."

26

27          [9] Indeed, Appellants structure their arguments this way, as well.  (See COB, pp. i-ii; WOB,
       pp. i-ii.)  Specifically, Appellants' issues 1-4 all relate to Appellants' termination date.  Appellants'

28     issues 5-10, by contrast, all relate to the company event.

bankruptcy court erred in finding the Company Event occurred on July 2, 2007 when the iStar transaction closed.  (COB, pp. 19-30; WOB, pp. 19-30.)

### 1.    "Company Event" Is Not an Ambiguous Term (Appellants' Issues 7-10)

Appellants first assert that the term "Company Event" as defined in the MCAs is ambiguous because "the MCA[s] do[] not specify or define a particular date as constituting the date on which the "Company Event" is deemed to have occurred." (COB, p. 19; WOB, p. 19.)   Because the term "Company Event" is ambiguous, Appellants argue, its meaning must be strictly construed against the drafter under California law.  (COB, pp. 19-20, citing Cal. Civ. Code §1654; WOB, pp. 19-20, citing Cal. Civ. Code §1654.)   Appellants assert the bankruptcy court committed "clear error when it interpreted the ambiguity against [Appellants] and found the 'Company Event' occurred on July 2, 2007 based on the date the transaction 'closed.'"  (COB, pp. 20; WOB, p. 20.)

Notably, Appellants cite no authority for the proposition that the term "Closing Date" is ambiguous simply because the MCAs failed to specify a specific date on which a "Company Event" would occur.  Indeed, Appellants entered into the MCAs with FGC in 2003, roughly four years before the iStar transaction was ever in discussion.  It would have been impossible (and defeated the purpose of the MCAs) to include a date certain in the MCAs for a Company Event that no one envisioned.  Nor is the definition of a Company Event ambiguous for failure to identify the specific point in a transaction that would constitute a Company Event.  Again, Appellants' suggestion otherwise presupposes the impossible – that FIL and Appellants could have known *ex ante* what such a transaction would look like.  Not all transactions are structured the same and the MCAs were not ambiguous for failing to predict an

unknowable future.  Instead, the MCAs set forth in clear and unambiguous terms *circumstances* that would constitute a company event: a third-party's acquisition or control of at least 50% of FIL's voting securities.  The bankruptcy court did not err in failing to read an ambiguity into the MCAs that does not exist.[10]

### 2. The Bankruptcy Court Did Not Err in Finding iStar Lacked Control Over the Assets Until July 2, 2007 (Appellants' Issue 8)

Appellants assert the bankruptcy court committed clear error in failing to find iStar acquired "control" over the CRE assets as of May 21, 2007.  It is true that the APA required FIL to manage the CRE assets "prudently and in the ordinary course of business" and limited FIL's ability to "take any material actions" with respect to any of the loans without iStar's prior written consent.  (AA, Vol. 11, Tab 44, p. 2766, §5.01(a).)  But the bankruptcy court correctly concluded that such veto power is not the same as actual control.

The power to "control" is "direct or indirect power to govern the management and policies of a person or entity" or the "authority to manage, direct, or oversee" it. CONTROL, Black's Law Dictionary (10th ed. 2014); *accord* CONTROL, Oxford

---

[10] Appellants also contend the bankruptcy court erred in finding the Company Event occurred on July 2, 2007 because, Appellants argue, such a finding conflicts with the general intent of the MCAs.  Citing California Civil Code 1650 – which provides "[p]articular clauses of a contract are subordinate to its general intent" – Appellants argue any provision of the contract that would permit FGC to terminate Walker or Colburn before a Company Event is ambiguous because it conflicts with the general intent of the MCAs.  However, as FCG correctly observes (DOB, pp. 19-20), Appellants failed to make this argument below and have waived it on appeal.  *See Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal").  In reply, Appellants offer no response to FGC's contention that Appellant's waived this argument by failing to raise it below.  (*See also*, AA, Vol. 7, Tab 15, pp. 1841-1882 (Appellant's trial brief, which fails to cite or discuss California Civil Code section 1650).)

English Dictionary, http://www.oxforddictionaries.com/definition/english/control, accessed February 24, 2015 (defining control as the power to "[d]etermine the behaviour or supervise the running of").[11]  As the bankruptcy court correctly found, the power iStar acquired as of May 21, 2007 under the APAs was not so extensive. Rather, the APA "provide[d] that during the escrow period the [CRE] business would essentially remain as close to the status quo as possible" to ensure "that the integrity of the loans would be maintained to [iStar's] satisfaction pending the close of the sale." (FA, Tab 68, p. 183:10-18.)  That is, APA provided iStar with enough authority to ensure that at the close of escrow iStar got what it originally bargained for.  But the APA did not give iStar the authority to otherwise affirmatively "direct" or "manage" the CRE loans on its own.[12]

Nor does the Court conclude that the bankruptcy court was "dead wrong" in concluding "iStar's conduct during the [escrow] period was consistent with the provisions of" the APA.  (FA, Tab 68, p. 183:19-21.)  Indeed, Appellants admit as much.  (COB, p. 23; WOB, p. 23; AA, Vol. 7, Tab 12, p. 1725, ¶13.)   It is true that Haboucha and Whitesell testified they began working closely with iStar after May 21, 2007 in managing their respective portions of FIL's larger CRE portfolio.  But even that testimony reflects iStar's authority under the APA to stop, rather than the power to direct or initiate.  As FGC's financial expert testified, "purchase agreements always have a provision that limits the seller from entering into transactions that could materially change the nature or value of the assets being sold," and the testimony of Haboucha and Whitesell was consistent with that "standard operating procedure."

---

[11] The APAs did not include a special definition for the term "control," and neither party contends the term was used in any technical sense.  Accordingly, the court must construe the term in its "ordinary and popular sense." Cal. Civ. Code §1644.

[12] Appellants cite no evidence, for example, that iStar had the authority to sell, securitize, modify, or forgive any of the CRE loans without FIL's consent.

(FA, Tab 67, pp. 166-167, ¶16(f).)  Considering all the evidence, the bankruptcy court found that iStar's limited pre-closing authority gave iStar the power to preserve, not the power to control.  That conclusion was well-supported by the evidence and was not clearly erroneous.[13]

### 3.   The Bankruptcy Court Did Not Err in Finding iStar Acquired the Assets on July 2, 2007 (Appellants' Issues 5-7)

Appellants next argue that, even if iStar did not gain control of the assets prior to closing, the Company Event occurred as of 12:00 a.m. on June 29, 2007, the "Execution Date" in specified the Assignment and Assumption Agreements.  (COB, pp. 23-28; WOB, pp. 23-28.)  It is unclear where Appellants derive their assertion that the Assignments were executed as of 12:00 a.m. rather than 11:59 p.m. (the time specified in the APA).  Plaintiffs concede, for example, that FIL and iStar prepared the Assignment and Assumption Agreements with effective dates of June 29, because the final closing condition was satisfied on June 22, and June 29 (the last business day in June 2007) was the date specified for closing in the APA.  (COB, p. 27; WOB, p. 27.)  Yet Appellants ignore the fact that the APA expressly provided the iStar transaction would close at *11:59 p.m.*  (AA, Vol. 11, Tab 44, p. 2747, §2.05.)  That is, even assuming iStar "acquired" the CRE portfolio on the date the parties initially *expected* the transaction to close (June 29) rather than the day it *actually* closed (July 2), the evidence is undisputed that the parties expected the transaction to close at

---

[13] Moreover, even if this were a mixed question of law and fact requiring the Court to review the bankruptcy court's finding *de novo*, the result would be the same.  Looking at all the evidence, the Court agrees that iStar's limited pre-closing authority did not give iStar "control" of the CRE loan portfolio.  The Court agrees with the testimony of FGC's expert Michael LeRoy that it would be "incredible" to conclude that FIL would cede complete control over its multi-billion-dollar asset portfolio to iStar without payment, due diligence, or any other assurances that the deal would actually close.  (*See* FA, Tab 67, p. 166, ¶16(f).)  A family selling its home does not give the buyer authority to bulldoze the property while the sale is still in escrow and while the family still lives in it.

1    11:59 p.m. on June 29, 2007.[14]

2

3        More importantly, however, the bankruptcy court did not err in concluding that

4    iStar acquired the assets on July 2, 2007, when the iStar transaction actually closed.

5    Appellants are correct that the Assignment and Assumption Agreements (consistent

6    with the APA) designated June 29, 2007 as the "Effective Date" for assignment of the

7    CRE portfolio to iStar.  (AA, Vol. 11, Tab 45 p. 2795, "Background Fact" D; Tab 47,

8    p. 2821, "Background Fact" D.)  However, it was also undisputed at trial that iStar

9    *failed to wire the purchase price to FIL* on the June 29 closing date in breach of the

10   APA and the Assignment and Assumption Agreements.  (AA, Vol. 10 , Exh. 42, p.

11   2722; FA, Exh. 64, p. 110.)   It was further undisputed that FIL delivered the

12   assignments *to the escrow agent*,[15] which did not release them to iStar until July 2,

13   when escrow closed.  (FA, Exh. 64, p. 110.)   Indeed, the entire purpose of an escrow

14   is to ensure that neither party acquires the other's property (in this case, iStar's cash

15   payment or FIL's CRE assets) until both parties have paid up.[16]

16

17       In this light, the bankruptcy court did not ignore the "Effective Date" set out in

18   the Assignment and Assumption Agreements as Appellants suggest.  The court below

19   merely considered *all of the evidence* and found evidence that iStar did not acquire

20   _____

21   [14] Because, as discussed below, the bankruptcy court correctly found Appellants'
     "Termination Date" under the MCAs was June 29, 2007, this fact is dispositive.  The evidence is

22   undisputed that Colburn and Walker received their termination notices on the morning of June 29,
     2007 – i.e., prior to 11:59 p.m.  (AA, Vol. 6, Tab 7, p. 1636-37, ¶¶22, 23.)  Even if the bankruptcy

23   court had erred in finding the Company Event occurred on July 2, any such error would have been
     harmless.  Whether iStar acquired the CRE portfolio on July 2 or at 11:59 p.m. on June 29, the

24   evidence showed Appellants received their notices *before* iStar acquired the CRE assets.

25   [15] Appellants concede this point in reply.  (*See* RB, p. 12 (observing "the assignment

26   documents were delivered to escrow prior to closing and <u>not</u> to iStar") (emphasis in original).)

27   [16] Again, to use the more familiar analogy of a home sale, a buyer who does not pay does not
     acquire the home simply because he *expects* escrow to close.  The buyer acquires the property when

28   he pays the escrow agent and the escrow agent releases title.

1   any assignments from the escrow agent until July 2 more persuasive – a conclusion
2   this Court shares.  And contrary to Appellants suggestion, the bankruptcy court did
3   not erroneously find that the recordation of the assignments controlled when iStar
4   acquired the assignments.  (See COB, p. 25; WOB, p. 25.)  The assignments were
5   recorded on July 3 and July 9, but the court below found iStar acquired the CRE assets
6   on when escrow closed and the escrow agent released those assets to iStar July 2,
7   *before* the escrow agent recorded either assignment.

8

9        Nor do appellants offer anything to suggest the bankruptcy court improperly
10  ignored an "admission" by FGC that the Company Event occurred before July 2,
11  2007.  Appellants note Walker's June 22, 2007 and July 24, 2007 letters to FGC in
12  which he sought to confirm the occurrence of a Company Event, but that FGC never
13  responded to the letter.  (AA, Vol. 9, Tab 34, p. 2297; Vol. 9, Tab 35, p. 2302 Vol. 6,
14  Tab 7, ¶19.)  Appellants assert that FGC's failure to respond to Walker's letters
15  constituted an adoptive "admission that the Company Event had already occurred as
16  of June 22, 2007."  (COB, p. 29; WOB, p. 29.)  In finding the Company Event
17  occurred on July 2, 2007 when iStar acquired control of the CRE assets, Appellants
18  contend, the bankruptcy court improperly ignored evidence of those adoptive
19  admissions.  (COB, p. 29; WOB, p. 29.)

20

21        Assuming for the sake of argument that FGC's failure to respond constituted an
22  adoptive admission, Appellants confuse that evidentiary admission with a conclusive
23  judicial admission.  Judicial admissions, are binding on the party, and are generally
24  unambiguous *affirmative* statements made by counsel *in the context of litigation*, and
25  "commonly arise by way of stipulations, pleadings, statements in pretrial orders, and
26  responses to requests for admissions. Some degree of formality is entailed."  *In re
27  Applin*, 108 B.R. 253, 258 (Bankr. E.D. Cal. 1989); *accord American Title Ins. Co. v.
28  Lacwlaw Corp*., 861 F.2d 224, 226.  Even then, judicial admissions are only binding

22

in the specific lawsuit in which the party makes them. *BNSF Railway Co. v. O'Dea*, 572 F.3d 785, 788 n.4 (9th Cir. 2009).   Appellants do not cite, and the Court's independent research did not identify, a single case where a party's failure to respond to a principal-to-principal letter sent outside the context of litigation amounted to a conclusive judicial admission. [17]

    If anything, FGC's failure to respond to Walker's letter constitutes an evidentiary admission. "Evidentiary admissions, unlike judicial admissions, are mere evidence, are not conclusive, and may be contradicted by other evidence." *In re Applin*, 108 B.R. at 259.  Evidentiary admissions "may be discredited or disbelieved by the trier of fact." *Wilbur-Ellis Co. v. M/V Captayannis "S"*, 451 F.2d 973, 974 (9th Cir. 1971).  As the Seventh Circuit correctly put it, an evidentiary admission is "just [] one more bit of evidence to weigh against" other evidence in the case. *Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000).  Here, the record reflects that the bankruptcy court considered all of the evidence before it and concluded that iStar did not acquire or otherwise control the CRE assets until escrow closed and the escrow agent delivered the assignments to iStar on July 2, 2007.  Indeed, the fact that Walker wrote to "confirm the occurrence of a 'Company Event'" the same day that the last escrow condition was satisfied suggests that Walker, too, believed the iStar transaction was still tenuous until the deal was finally ready to close.  The bankruptcy court agreed, but found based on all the evidence that iStar did not acquire or otherwise have the authority to directly control the CRE assets until the escrow agent finally released them on July 2. That finding was supported by substantial evidence in the record, and was not clearly erroneous.  Indeed, to the extent this can be construed as a mixed question of law and fact subject to the Court's *de novo* review, the Court agrees with the bankruptcy court's finding in its own right.

---

[17] This is in contrast with a party's failure to respond to a request for admission *in the context of litigation discovery*, which a court may deem conclusively admitted. Fed. R. Civ. Proc. 36(a)(3).

1

2       **B.**     **The Bankruptcy Court Did Not Err in Concluding Appellants'**

3             **"Termination Date" Was June 29, 2007 for the Purposes of**

4             **their MCAs**

5

6       Because the bankruptcy court correctly found that the Company Event occurred

7   on July 2, 2007 when iStar acquired the CRE assets and took control over them,

8   Appellants' Termination Date under the MCAs is crucial to determining whether

9   Appellants stated a viable bankruptcy claim for breach of the MCAs.  All parties agree

10   that Appellants' Termination Date must have occurred later in time than the relevant

11   Company Event to invoke the MCAs' 36-month separation pay provisions.  However,

12   Appellants contend the bankruptcy court clearly erred when it found Appellants'

13   Termination Date under the MCAs was June 29, 2007 – three days before the July 2,

14   2007 Company Event.  Appellants argue their Termination Date under the MCAs was

15   August 28, 2007, the date the termination letters stated Appellants' employment

16   would "terminate."  (COB, pp. 13-19; WOB, pp. 13-19.)

17

18       **1.**     **The MCAs' Definition of "Termination Date" Was Not**

19            **Ambiguous (Appellants' Issue 4)**

20

21       As with the term "Company Event," Appellants contend that the MCAs were

22   ambiguous in their definition of the term "Termination Date," and that any ambiguity

23   must be construed against FGC.  (COB, p. 14; WOB, p. 14, RB, p. 8.)  The MCAs

24   used the phrase "Termination Date" as a term of art, and, to the extent the MCAs used

25   the phrase as a term of art, the contractual definition of Termination Date governs its

26   meaning.  Cal. Civ. Code §1644.  Relevant here, section 8(e) of the MCAs defines

27   "Termination Date" as "the date on which a notice of termination is given … ."  (AA,

28   Vol. 8, Tab 28, p. 2279, §8(e); Tab 29, p. 2289, §8(e).)  Section 10(b) of the MCAs, in

1    turn, provided that a termination "shall be communicated by a notice of termination"

2    and "shall specify the termination date (which shall not be more than 30 days after the

3    giving of such notice)."  (AA, Vol. 8, Tab 28, p. 2280, §10(b); Tab 29, p. 2290,

4    §10(b).)  Appellants contend that these two provisions are in fundamental conflict

5    because, although section 8(e) provides that the "Termination Date" is the date on

6    which written notice is given, section 10(b) requires any written notice to specify the

7    "termination date," which could be any day within 30 days of the written notice.  (RB,

8    p. 8.)  Essentially, Appellants argue the MCAs included two separate definitions of a

9    "Termination Date," and that the one more favorable to them must control under

10    California Civil Code section 1654.  (*Id.*)

11

12          Looking more carefully at the MCAs, however, the MCAs did not include

13    contradictory definitions of the term of art "Termination Date."  The MCAs contain

14    several terms of art that are specially defined in the agreements.  (AA, Vol. 8, Tab 28,

15    pp. 2273, 2277-79, §8; Tab 29, p. 2283, 2287-89, §8.)  The MCAs define each term of

16    art with capitalized spelling (e.g., "Executive," "Company Event," "Involuntary

17    Termination," "Termination Date"), and consistently use this capitalized spelling each

18    time the term of art appears to signify that the particular term is being used in its

19    technical sense.  Notably, however, the requirement in section 10(b) that a written

20    notice of termination "specify the termination date" does not use the phrase as a

21    capitalized term of art.  This is despite the fact that section 10(b) uses other terms of

22    art in their special sense.  (*See* AA, Vol. 8, Tab 28, p. 2280, §10(b) (same section

23    using contractually defined terms "Company," "Cause," "Executive," "Involuntary

24    Termination," and "Agreement" as capitalized terms of art); Tab 29, p. 2290, §10(b)

25    (same).)    Instead, section 10(b) uses the phrase "termination date" in its ordinary

26    sense – i.e., the final day of employment.

27

28          Although the MCAs provide that the "Termination Date" for the purpose of

determining a severance payment is the date of notice, the agreement recognizes that not all termination notices are given on an employee's last day.[18] That is, while an Executive is technically "Terminated" for the purpose of a severance payment as soon as he or she receives written notice of termination, the MCAs also required FGC to give Appellants some indication of when they would need to pack their things if FGC gave the Executive *advanced* notice that he or she would be terminated.  In this way, sections 8(e) and 10(b) are consistent and equally enforceable provisions of the MCAs.  *See Estate of Petersen,* 28 Cal.App.4th 1742, 1753, 34 Cal.Rptr.2d 449, 458 (Cal. Ct. App. 1994) (Contradictory or inconsistent provisions of a contract are to be reconciled by interpreting the language in such a manner that will give effect to the entire contract. [Citation]. A contract term should not be construed to render some of its provisions meaningless or irrelevant.")[19]

The bankruptcy court did not err in declining to find a conflict between sections 8(e) and 10(b) because the two terms are internally consistent.  To the contrary, it was the bankruptcy court's duty to reconcile those two sections, as it did, in a manner that gave effect to each.  Cal. Civ. Code §§1641, 1643.

### 2.   The Bankruptcy Court Did Not Err in Finding that Appellants' Termination Date Was June 29, 2007 for the

---

[18] It is also worth noting that the MCAs notice provisions were mutual – i.e., an Executive was also required to give FGC notice if they intended to leave the company.  It is common practice for employees to give an employer advanced notice before quitting their job.  There is nothing unusual about an employment contract that allows one party to give notice of termination before the employment "terminates" in the lay sense, even if the agreement uses a technical definition of "Termination Date" for some other purpose.

[19] *See also* Cal. Civ. Code §1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); Cal. Civ. Code §1643 ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.")

26

**Purpose of the MCAs (Appellants' Issues 1-3)**

The MCAs unambiguously provided that the "Termination Date" for the purpose of determining an Executive's right to a severance package would be "the date on which a notice of termination is given … ."  (AA, Vol. 8, Tab 28, p. 2279, §8(e); Tab 29, p. 2289, §8(e).)  Moreover, prior to trial, Appellants stipulated that they were "given written notice of [their] termination" on "the morning of June 29, 2007." (AA, Vol. 6, Tab 7, pp1636-1637, ¶¶22, 23.)  Under the plain terms of the MCAs, there is nothing else to discuss – Appellants "Termination Date" under the MCAs was June 29, 2007.

**a.    The Bankruptcy Court Did Not Ignore Evidence of an Admission (Appellants' Issues 1 & 2)**

Nevertheless, Appellants contend the bankruptcy court committed clear error in finding Appellants "Termination Date" under the MCAs was June 29, 2007, rather than August 28, 2007.  Appellants first argue the court below ignored evidence that FGC admitted Appellants were terminated on August 28, 2007 in FGC's December 2007 letter to the FDIC.  In a December 20, 2007 letter to the FDIC regarding FGC's potential liabilities to former executives, FGC stated that Walker and Colburn were both "terminated …on August 28, 2007."  (AA, Vol. 11, Tab 51, p. 2993.)  Appellants contend the bankruptcy court erred by "ignor[ing] the date expressly identified by FGC as [Appellants'] termination date and instead found that [they were] terminated on the date [they] received notice, June 29, 2007."  (COB, p. 14; WOB, p. 14.)  Again, however, the bankruptcy court did not *ignore* evidence of FGC's letter to the FDIC – the court below merely *discounted* that evidence in light of the other evidence before it.  (FA, Tab 68, p. 191:19-25.)  Again, Appellants' insistence that the bankruptcy court was somehow bound by FGC's "admission" to the FDIC confuses a judicial

27

1   admission with an evidentiary admission.

2

3       As an evidentiary admission, the bankruptcy court was free to discount the

4   December 2007 FDIC letter, even if the evidence of an August 28, 2007 "Termination

5   Date" was *uncontroverted. See Smith v. C.I.R.*, 800 F.2d 930, 935 (9th Cir. 1986)

6   ("the trial court is not compelled to accept even uncontroverted testimony when it

7   doubts the credibility of a witness").  But the evidence was highly controverted, by

8   Walker's own admission (among other evidence).  In his July 24, 2007 letter to FGC

9   titled "Management Continuity Agreement of August 7, 2003," for example, Walker

10   stated "[o]n June 29, 2007, my employment with [FGC] and [FIL] (collectively, the

11   "Company") was terminated by the Company without cause."  (AA, Vol. 9, Tab 35, p.

12   2302.)  Moreover, the evidence showed that, consistent with the termination notices,

13   June 29, 2007 was Appellants' last day in the office and they did no further work for

14   FGC or FIL after that date.  (*See*, *e.g.*, AA, Vol. 14, Tab 53, p. 3317:6-8.)  And in an

15   October 2007 regulatory filing, FGC stated Walker had been "replaced" as of June 29,

16   2007.  (AA, Vol. 9, Tab 36, p. 2320.)

17

18       Moreover, although the termination notices stated Walker and Colburn's

19   employment would formally "terminate" on August 28, 2007 and that Appellants

20   would "continue on FIL's Payroll" until that date, the evidence showed that 60-day

21   delay was the result of a legal obligation under the WARN Act to give Appellant's 60-

22   days' notice of a layoff.  (AA, Vol. 6, Tab 7, p. 1637, ¶24; AA, Vol. 7, Tab 14, p.

23   1831:9-17.)  Indeed, Walker admitted he understood the termination letter's reference

24   to August 28, 2007 and a sixty-day period to be FGC's and FIL's attempt to satisfy

25   the WARN Act by providing 60-days' notice of a termination.  (AA, Vol. 13, Tab 54,

26   pp. 3340:11-3341:2.)  Neither Colburn nor Walker presented any evidence that they

27   continued to do any work for FIL or FGC after June 29, 2007.  The weight of the

28   evidence showed that, for all practical purposes, Colburn and Walker's employment

"terminated" on June 29, 2007, when they left FIL never to return again.   The bankruptcy court did not err in discounting a single evidentiary admission in favor of overwhelming evidence to the contrary.

More importantly, though, the bankruptcy court's task was not to determine when Appellants' were formally "terminated" as that term is commonly used.   It was the bankruptcy court's duty to ascertain Appellants' "Termination Date" as that phrase was defined in the MCAs.   The parties stipulated prior to trial that Appellants were "given written notice of [their] termination" on "the morning of June 29, 2007."  (AA, Vol. 6, Tab 7, pp. 1636-1637, ¶¶22, 23.)   Unlike FGC's evidentiary admission to the FDIC, that pretrial stipulation constituted a binding *judicial admission*, and the bankruptcy court was bound by it.   The MCAs defined "Termination Date" as "the date on which a notice of termination is given," not "the last day for which an Executive is paid."   (AA, Vol. 8, Tab 28, p. 2279, §8(e); Tab 29, p. 2289, §8(e).)   In light of that unambiguous language and Appellants' judicial admission that they received notice of their termination on June 29, 2007, the bankruptcy court did not err in concluding, consistent with the evidence and the terms of the MCAs, that Appellants "Termination Date" was June 29, 2007.

### b.     The Bankruptcy Court Did Not Err in Concluding the Termination Notices Substantially Complied with the MCAs

To avoid this ineluctable conclusion, Appellants next contend "the June 29, 2007 letter *cannot* constitute notice pursuant to section 10b of the MCA because it does not comply with the notice requirements stated in that section of the MCA." (COB, p. 14; WOB, p. 15.)   Appellants insist the June 29, 2007 termination notices cannot have constituted notice under the MCA because it was not independently

drafted as an MCA-specific notice. (COB, pp. 16-17; WOB, p. 16.)  This argument finds no support in the language of MCAs.  Nothing in the MCAs required that a termination notice be drafted with the MCAs specifically in mind as Appellants suggest.  The MCAs merely required any notice of termination be made in writing and include a few pieces of information.[20]

Appellants admit that the notices of termination were in writing and personally delivered as required by section 10(a).  (AA, Vol. 6, Tab 7, pp. 1636-1637, ¶¶22, 23.)  And while it is true that the notices did not identify a "specific termination provision" in the MCAs, the bankruptcy court correctly observed that requirement "was inapplicable as the termination notices made it clear that termination was without cause."   (FA, Tab 68, pp. 185:19-186:4.)   The MCAs expressly outlined circumstances constituting "Cause" for termination.  (AA, Vol. 8, Tab 28, p. 2277, §8(a); Tab 29, p. 2287, §8(a).)  This express set of circumstances constituting "Cause" was critical under the MCAs because an Executive terminated for "Cause" was not entitled to any severance benefits.  (AA, Vol. 8, Tab 28, pp. 2276, §7(a)(ii), 2280, §10(b); Tab 29, p. 2286, §7(a)(ii).)   Section 10(b) concerned terminations with and without "Cause."  (AA, Vol. 8, Tab 28, pp. 2277, §8(a), 2280, §10(b); Tab 29, p. 2287, §8(a), 2290, §10(b).)   However, when reading the MCAs as a whole and to avoid impossible terms (Cal. Civ. Code §§1641, 1643), section 10(b)'s requirement that a notice of termination specify the precise "termination provision" clearly applies to terminations for "Cause."  It would have been impossible for a termination notice to identify a "specific termination provision" in a true termination *without* Cause because no such "termination provision" exists – that is the point of a termination without cause.

---

[20] The MCAs did not specially define a "notice of termination" as a term of art.  (*See*, AA, Vol. 8, Tab 28, p. 2277-2279, §8 (defining specific terms of art for use in Walker's MCA and omitting "notice of termination"); Tab 29, pp. 2287-2289 (same in Colburn's MCA).  Instead, the MCAs used the phrase "notice of termination" in its ordinary sense – a notification that the Executive was being terminated or was resigning.

1

2    Appellants further urge that the bankruptcy court erred in finding the

3    termination notices sufficient because the notices failed to set forth the facts and

4    circumstances claimed to be the basis for the termination, as required under section

5    10(b).  (COB, p. 17, WOB, p. 17.)   Appellants offer no factual support for this

6    conclusion.   To the contrary, the termination notices stated the reasons Appellants

7    were being laid off.  Walker's termination notice stated he was being terminated "due

8    to recent organization changes" and Colburn's notice informed her she was being

9    terminated "due to the sale of the Commercial Real Estate division."  (AA, Vol. 9,

10   Tab 32, p. 2295; Tab 33, p. 2296.)  Appellants do not identify any evidence to suggest

11   these explanations were insufficient to put them on notice of the factual basis for their

12   termination under the MCAs.  Rather, Walker and Colburn both testified that they

13   knew as early as May 14, 2007 that the iStar transaction would result in their

14   termination.  (AA, Vol. 6, Tab 8, p. 1662, ¶21; Tab 9, p. 1678, ¶30.)  The termination

15   notices reiterated what Appellants already knew, and adequately informed Appellants

16   of the reason for their termination under the MCAs.

17

18   Last, Appellants contend the termination notice was inadequate under section

19   10(b) of the MCAs because "the letter provides for a 60[-]day notice period whereas

20   Section 10(b) of the MCA states that the termination date cannot be more than 30 days

21   after notice is given."  (COB, p. 17; WOB, p. 17.)  Appellants stipulated before trial

22   that the 60-day notice period set forth in the termination notices was required by law

23   under the WARN Act.  (AA, Vol. 6, Tab 7, p. 1637, ¶24.)  However, they contend that

24   the termination notices were invalid under the MCAs for complying with the law and

25   giving them *too much* notice.  Unsurprisingly, Appellants do not elaborate on this

26   single-sentence argument. (*See* COB, p. 17, WOB, p. 17; *see also* RB, p. 7 (noting

27   that the termination letters "identify a termination date more than 30 days from the

28   date of the letters").)  Even if the termination notices were not in technical compliance

with section 10(b) because the notices provided 60- rather than 30-days' notice of termination, the bankruptcy court did not err in concluding the termination notices were sufficient under the MCAs.  To the extent the MCAs required a notice period for mass layoffs shorter than the 60-day notice period required by law, the Court must disregard that unenforceable provision under the MCAs' severance clause.  (AA, Vol. 8, Tab 28, p. 2281, §12(e).

### c.   The Bankruptcy Court Did Not Err in Concluding the Termination Notices Substantially Complied with the MCAs

Finally, Appellants contend the bankruptcy court erred in concluding Appellants' "Termination Date" under the MCAs was June 29, 2007 because the "finding is contrary to the law and puts FIL in violation of [California] Labor Code §201 ... ."  (COB, p. 18, WOB, p. 18.)  Under California Labor Code section 201(a), an employer must pay any unpaid wages within 72 hours of discharge.  As FGC notes in opposition (DOB, p. 14), and as the bankruptcy court held in denying Appellants' motion for reconsideration (AA, Vol. 14, Tab 57, pp. 3661-3676), Appellants failed to raise this argument at trial and have waived it on appeal.  *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011).  Appellants do not pursue this argument in reply or offer any response to FGC's assertion of waiver.

Even on the substance, however, the argument is unavailing.  Appellants confuse the term of art "Termination Date" as used in the MCAs with "discharge" as used in California Labor Code section 201(a).  As discussed above, a "Termination Date" under the MCAs concerned the date on which the employee received *notice of termination*, even if the actual date of discharge was in the future.  Labor Code section 201, on the other hand, is concerned with the date an employee is actually *discharged*.

Cal. Lab. Code §201(a).  The termination letters provided (and Appellants repeatedly admit) Appellants' date of formal discharge was August 28, 2007 in light of the WARN Act.  But that is distinct from the contractually-defined "Termination Date" at issue here, which hinged on the written notice, not Appellants' final pay day.    If either Walker or Colburn believed FGC or FIL failed to pay them wages within 72 hours of discharge in violation of California Labor Code section 201, their remedy was to bring suit (or state a claim in bankruptcy) for damages under the California Labor Code.  They did not do so.

**IV.    Conclusion**

After a full review of the record on appeal, the Court does not find that bankruptcy Court committed clear error in finding: (a) the Company Event occurred on July 2, 2007 when the escrow agent released the CRE assets to iStar and iStar took possession and control of them, and; (b) Appellants' Termination Date (as defined in the MCAs) was June 29, 2007 when Appellants admit they received their written notices of termination from FIL and FGC.  Both findings are well supported by the weight of the evidence.  Moreover, to the extent the Court either of those questions may be considered a mixed question of law and fact subject to *de novo* review by this court, the Court independently agrees with the bankruptcy court's findings as discussed more fully above.

Because it is undisputed that Appellants' MCAs only provided the 36-months' severance pay if Appellants' Termination Date followed a Company Event in time, those two findings of fact are dispositive.  Appellants' "Termination Date" preceded the "Company Event" by three days, and Plaintiffs are not entitled to any severance benefits under the express terms of their MCAs.  Because Appellants' have no claim against FGC for breach of the express terms of the MCAs (the only claim Appellants

advanced below or on appeal), the bankruptcy court did not err in disallowing Appellants' bankruptcy claims, and the Court **AFFIRMS** the bankruptcy court's March 21, 2014 disallowing Appellants' claims.

The clerk is directed to enter the judgments on appeal, give notice, and return the physical records on appeal to the bankruptcy clerk.  Fed. R. Bankr. P. 8024.

Appellees are to be awarded their costs on appeal, which shall be taxable in the bankruptcy court.  Fed. R. Bankr. P. 8021(a), (c).

**IT IS SO ORDERED**

Dated:  March 20, 2015                              _____
                                                   ANDRÉ BIROTTE JR.
                                                   UNITED STATES DISTRICT JUDGE